```
          IN THE UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF TEXAS
                    DALLAS DIVISION

BISOUS BISOUS, LLC          )
                            )
          Plaintiff,        )
                            )
vs.                         )  3:21-CV-1614-B
                            )
THE CLE GROUP, LLC, BISOU,)
UPTOWN MANAGER, LLC, and   )
JOHN DOES 1-10,            )
                            )
          Defendants.       )

          MOTION FOR PRELIMINARY INJUNCTION
          BEFORE THE HONORABLE JANE J. BOYLE
             UNITED STATES DISTRICT JUDGE
                   AUGUST 11, 2021

              A P P E A R A N C E S
For the Plaintiff:

FISH & RICHARDSON, PC
1717 Main Street - Suite 5000
Dallas, TX  75201
214/747-5070
     Email: conrad@fr.com
     BY:  DAVID B. CONRAD

For the Defendant:

     BUETHER JOE & COUNSELORS, LLC
     1700 Pacific Avenue - Suite 4750
     Dallas, TX  75201
     214/730-5660
     Email: ken.kula@bjciplaw.com
     BY:  KENNETH P. KULA
          CHRISTOPHER M. JOE

COURT REPORTER:  SHAWNIE ARCHULETA, TX CCR No. 7533
                 1100 Commerce Street
                 Dallas, Texas 75242

proceedings reported by mechanical stenography,
transcript produced by computer.
```

```
 1                    (In open court at 3:15 p.m.)
 2                    THE COURT:  Good afternoon.
 3                    This is Case Number 3:21-CV-1614.  I think
 4       it's Bisous -- but you-all can pronounce it for
 5       me -- Bisous, LLC, v. the Cle Group, LLC.
 6                    Who is here for the plaintiff, and how do
 7       you pronounce their names?
 8                    MR. CONRAD:  Good morning, Your Honor.
 9       David Conrad on behalf of the plaintiffs.
10                    THE COURT:  How do you pronounce it?
11                    MR. CONRAD:  Bisous Bisous.
12                    MR. KULA:  Kenneth P. Kula with
13       Christopher Joe on behalf of the defendants.
14                    THE COURT:  Okay.  We have a motion for
15       preliminary motion.  I have read through all of it
16       and your cases and your addendums and everything
17       else.  And I have looked at both sides' record
18       exhibits, including the tapes.  And I would just
19       like to hear from you, you know, not all of the
20       motion again, but come on up here, please.
21                    Mr. Conrad.
22                    MR. CONRAD:  Mr. Conrad, that's right,
23       Your Honor.
24                    THE COURT:  Who do you work for?
25                    MR. CONRAD:  I am with Fish & Richardson.
```

```
 1              THE COURT:  Okay.  Okay.  Take your time.
 2              I'll cut you off when I think I need to
 3              MR. CONRAD:  Good morning, Your Honor.
 4              THE COURT:  Good afternoon.
 5              MR. CONRAD:  It's unfortunate that we are
 6   here today.
 7              We had received notice -- my client had
 8   received notice around the early part of January
 9   this year that a Houston restaurant group was going
10   to be opening a restaurant in Dallas with a
11   confusingly similar name, Bisou, to my clients
12   trademark Bisous Bisous.
13              And immediately, they notified the
14   defendants, sent a letter, and --
15              THE COURT:  Before you sent them a letter?
16              MR. CONRAD:  Around January 25th, I
17   believe, we sent them a letter, a cease and desist
18   telling them not to do this.
19              And they responded, and they said things
20   like our mark was generic, that there was no
21   confusion, and that they weren't going to comply.
22              In addition to that, they filed their own
23   federal registration for Bisou.  They hadn't already
24   done that, but they went ahead and did that at this
25   point.
```

1              We didn't hear much for a little while.

2      And then sometime around June, a vendor shows up to

3      my client's pâtisserie down on McKinney Avenue, and

4      they were confused.  They went to the location that

5      they thought was the restaurant Bisou.

6              In addition, around that time, someone

7      showed up for a job interview.  They also were

8      confused.  They were looking for Bisou, the

9      restaurant, not Bisous Bisous, the pâtisserie.

10              My client has been here since the early

11      part of the 2010s.  So she started in the White Rock

12      local market selling her own macarons.  She quit her

13      corporate job to start this -- this bakery.  And she

14      graduated from the market to a local restaurant on

15      McKinney Avenue, her dream.  And that was around

16      2014/2015, and her restaurant has been there since,

17      her pâtisserie.

18              Now --

19              THE COURT:  How many years has it been

20      there?

21              MR. CONRAD:  Around 2014/2015 with a

22      physical retail location on McKinney Avenue.

23              THE COURT:  Okay.  She's done the best she

24      could to build this brand over the years.  She's

25      done interviews on TV.  She's promoted the brand and

1    mark on social media.  She's been out there making a

2    name for it and doing quite well.

3            She's successful objectively by people who

4    like her pastries, her macarons and whatnot.  And

5    Bisous Bisous is part of that fame here in Dallas.

6            So when the defendants came in, it caused

7    immediate harm to her.  Not only was there actual

8    confusion that -- that was apparent when the

9    plaintiff began coming in, but they set up an

10   opening night on July 7th.  And on the screen here

11   is an Instagram post advertising it, and you can see

12   they used the word "Bisou."

13           They had an opening night on July 7th.

14   And then immediately thereafter, we started

15   receiving negative reviews on Google.  If you can

16   see here on the screen --

17           THE COURT:  Now, this isn't the girl who

18   was upset about being fired or anything.

19           MR. CONRAD:  I -- I don't know, Your

20   Honor.

21           THE COURT:  Okay.

22           MR. CONRAD:  I'll let them talk about that

23   if they want to.  I'm not going to worry about that.

24           The fact is someone posted negative

25   reviews on here.  And if you can see at the bottom

1    it says from someone named Aneth, said, "Very rude

2    service would not go back ever again.  Do not

3    recommend."  One star.

4            And you see above that there's a response

5    from the owner, where staff from Bisous Bisous

6    Pâtisserie is having to respond to this and deal

7    with it and counteract the negative effect of a

8    one-star review.  That wasn't it.  There were many

9    one-star reviews that appeared all of a sudden.

10           Now, the meaning behind that and why it

11   happened, I don't know.  I will let the defendants

12   speak to that.  But the fact was these individuals

13   thought they were posting to Bisou restaurants when,

14   in fact, they were trying to trash the review system

15   for Bisous Bisous -- when, in fact, they were

16   trashing the review system for Bisous Bisous

17   Pâtisserie.

18           Now, these one-star reviews are incredibly

19   harmful.

20           THE COURT:  . . . body slam me, that's a

21   little -- go ahead.

22           MR. CONRAD:  Well, these restaurants and

23   the like, they live and die by these reviews.

24   Because if it drops below a certain level, say below

25   a 4.0, some may consider that a negative commentary

1    on the restaurant and skip it.

2            So what happened in response to this,

3    Bisous Bisous representatives went to Google and

4    complained.  And Google did take about a two-week

5    period of these negative reviews off, but also any

6    good reviews that had occurred during that time

7    frame.  There was no choice.  They just wiped

8    everything for two weeks.

9            So not only did -- was she able to get

10   this back, anything good that would have raised her

11   level from 4.1 up towards 5 would have been gone, as

12   well, if there were five-star reviews.

13           So there was harm by this confusion.  And

14   as you can see on this slide right here, they are on

15   McKinney Avenue right down the road from each other

16   in the same entertainment district.

17               THE COURT:  Yeah, they are.

18               MR. CONRAD:  That's not the only other

19   kind of harm that we have actually experienced.

20           Here on the screen are several -- I

21   believe they are -- Instagram posts.  And on the

22   left, you will see one that looks like it's at a

23   club.  In the middle, you will see people that look

24   like they're at a bar.

25           And what you will notice on each of those

```
 1   is, at the top they were a check in, a tag at Bisous
 2   Bisous Pâtisserie, not at Bisou restaurant.  And on
 3   the bottom right, here's what the effect is.  When
 4   you look at Bisous Bisous Pâtisserie on Instagram
 5   and look at all their -- all their photos, which
 6   should be photos of people celebrating outside the
 7   storefront, macarons, cake, family, whatever else
 8   could be up there, pictures from Bisou restaurant
 9   started showing up.  And as you can see, they are
10   not all family friendly.
11           THE COURT:  Um-hum.
12           MR. CONRAD:  So Ms. Meyer, who founded the
13   restaurant, she testified in her declaration that
14   she will never know how many customers may have
15   decided not to visit or order from her pâtisserie
16   because they believed the negative reviews for Bisou
17   were about Bisous Bisous.  She won't know the ripple
18   effect of these negative reviews and the extent to
19   which people have been deterred from patronizing her
20   bakery merely because they have heard how awful a
21   place Bisous Bisous is.
22           THE COURT:  As of today, are they still
23   getting negative feedback from people?
24           MR. CONRAD:  I haven't had an update in
25   the past, two, three or four days, somewhere around
```

1    that time frame.  My client is actually receiving

2    medical treatment right now.

3                THE COURT:  But two or three days ago?

4                MR. CONRAD:  I don't know.  But up on the

5    screen I have something from August 3rd or 4th,

6    which is well after the previous events.

7                THE COURT:  Yeah, yeah.

8                MR. CONRAD:  And this is what we recently

9    filed here, if I may play it, Your Honor, is a

10   voicemail.

11               (Voicemail played.)

12               MR. CONRAD:  That individual on

13   August 3rd left that voicemail at my client's phone

14   number.  And on the next day, I guess he didn't get

15   a response for that, so he sent an email to Bisous

16   Bisous following up, trying to get that reservation,

17   Mr. Princeton Marcellus.

18               So here is another instance of confusion

19   that's -- it's still happening, not just for the

20   opening.  And this individual is so confused, he

21   tries one contact method for us and doesn't succeed

22   and then tries the other contact method for us, all

23   the time thinking he's trying to make a dinner

24   reservation.  My client doesn't do dinner

25   reservations.  There's only one Bisou-related

1    restaurant that does.

2            The problem we are facing is time

3    sensitive.  Here on the screen is a recent Instagram

4    post on Bisou's profile, advertising that the

5    original opening, I guess, was just a soft opening,

6    because their grand opening is coming up within a

7    week, next Wednesday, August 18th.  So what we have

8    experienced previously is now likely to happen all

9    over again and worse, because this is the real

10   opening.

11           So my client has experienced actual harm

12   already.  There's many instances of actual

13   confusion.  This was just a sample.  There's plenty

14   more in our filings.

15           THE COURT:  Yes, I have seen them.

16           MR. CONRAD:  I can walk you through each

17   of the digits of likelihood of confusion to show how

18   we are likely to win this case.  And I am happy to

19   do that if you want, but so far, the actual

20   confusion is overwhelming.

21           And as the cases say, when you have actual

22   confusion in the strength of a Mark, this one is

23   arbitrary.  We don't sell kisses.  That overwhelms,

24   and that's very convincing evidence that there's a

25   likelihood of confusion.

```
 1            THE COURT:  Okay.  Yeah, you don't have to
 2    go through the digits of confusion.  I will say,
 3    though, these are different products.  So tell me
 4    about that.
 5            MR. CONRAD:  Not exactly.  These are
 6    restaurant services that both of them provide.  And
 7    so when you're looking at the similarity of products
 8    of services, you don't have to have identical
 9    products or services.  It's not just a counterfeit.
10            So there are cases that we have cited,
11    such as the Exxon case, in which one of the
12    businesses was a -- they sold car parts, I believe,
13    or maintenance services.  And the other was Exxon,
14    as you know it, the petroleum company and the gas
15    station.  They didn't overlap in the sense that they
16    both sold gas or they both sold car parts or
17    maintenance.  It was close enough because everybody
18    had cars essentially, and it was likely to cause
19    confusion in the mind of potential purchasers.
20            We sell baked goods that are French
21    inspired.  The defendant's restaurant is -- they
22    call themselves a French-inspired restaurant.
23            Now, they don't have a dessert menu yet.
24    Of course they will, it's a restaurant.  I can't
25    imagine that they wouldn't.  The equivalent
```

```
 1   restaurant in Houston, Bisou in Houston, does have a
 2   dessert menu, which we provided in our briefing.
 3   And it has on its menu or baked good called Bisous
 4   Bisous.  So the similarity is close enough.
 5            THE COURT:  Yeah, but I mean direct
 6   competition between the parties, services or
 7   products is not necessary.
 8            MR. CONRAD:  That's right.  And also who
 9   was confused is -- is not necessarily has to be a
10   purchaser.
11            THE COURT:  Right.
12            MR. CONRAD:  The cases hold that it could
13   be vendors.  It could be merchants that are confused
14   about the association between the two.  So even
15   though there's not perfect overlap, which I think is
16   what the entire complaint of their response is, it's
17   not perfect overlap.
18            THE COURT:  And you have the wrong
19   defendant, but go ahead.  We'll talk about that
20   later.
21            MR. CONRAD:  Sure.  It doesn't have to be
22   complete overlap.  At the end of the day, there's
23   confusion, and it's causing a harm to my customer --
24   to my client.
25            And the Marks are incredibly similar.
```

 1   They sound the same.  It's just that ours is

 2   repeated twice.  So that is a very similar Mark.

 3          The fact that they -- they claim that they

 4   stylize theirs is not relevant to this discussion or

 5   it's not going to affect this discussion, because

 6   it's -- the confusion is not coming from the logo.

 7   The confusion is coming from -- also from things

 8   like social media handles.  Bisou -- at the Bisou

 9   DTX is confusingly similar to Bisous Bisous the

10   pâtisserie.  Hashtag Bisou on one of the social

11   media sites is confusingly similar.

12          When you check in at the restaurant on

13   Instagram or Facebook or the like, you're not going

14   to get Bisou's logo when you try to pick the

15   location you're at, you're going to get just the

16   name.  So the stylization is not important.  And it

17   doesn't matter what else they mix with it, because

18   when you see their postings, they have on their

19   social media postings things like, "The Cle Group

20   Requests the Pleasure," at the very top on slide 9.

21          They mention Cle Group somewhere else in

22   here, as well.  They've got the stylization and so

23   on, and people are still confused.  So the identity,

24   as close it needs to be for there to be likelihood

25   of confusion, hence the actual confusion.

1              Now, the intent part is not necessary.

2     We're not saying the defendants decided to pick

3     Bisou originally down in Houston and come after us.

4     But once they were made aware that we were already

5     in Dallas and their attorney, in their response

6     letter, acknowledged that we were known in Dallas,

7     then their actions can represent intent to stomp on

8     our Mark and the good will that our Mark has

9     created.

10             Evidence of intent is the fact that they

11    filed for a federal registration just in March after

12    we sent the notice of -- to cease and desist.

13             Intent is, they are continuing to trade on

14    this name, Bisou, and coming to Dallas despite us

15    telling them not to.

16             And some cases in the circuit even hold

17    that -- or have found that the fact that they have

18    tried to put a disclaimer, the fact they have tried

19    to put a disclaimer isn't evident of intent, trying

20    to get around the infringement of the Mark.

21             As far as degree of care goes, Your Honor,

22    it's apparent, because from the actual confusion

23    that these customers are not -- do not have a high

24    degree of care when the confusion is arising.

25    Confusion can happen at any point in the purchasing

```
 1    process.  And if someone is confused upfront and
 2    mixes it up and finds out later that they were wrong
 3    in the beginning, that's still confusion, and that
 4    degree of care at the outset is very low in these
 5    instances.
 6              THE COURT:  Okay.
 7              MR. CONRAD:  Your Honor, I believe that's
 8    all that I have.  If you have any questions --
 9              THE COURT:  No, I don't have any questions
10    right now.
11              Do you -- do you have -- do you believe in
12    the presumption of irreparable harm?  Or tell me
13    where that fits into this.
14              MR. CONRAD:  Yes.  That didn't use to
15    exist.  There was not necessarily a presumption of
16    irreparable harm, at least after eBay.
17              THE COURT:  Yeah.
18              MR. CONRAD:  But the Trademark
19    Modernization Act passed last year 15 U.S.C. 1116(a)
20    states that there is a rebuttable presumption of
21    irreparable harm upon a finding of likelihood of
22    success on the merits.
23              So if Your Honor finds that there is a
24    likelihood of success, we don't need to delve into
25    whether Bisous Bisous will be irreparably harmed.  I
```

1   don't believe there's been any evidence to rebut it.

2   I am happy to address it if there is.

3            THE COURT:  No need to address it right

4   now.

5            MR. CONRAD:  And -- but we have presented

6   evidence of irreparable harm.  As I mentioned

7   earlier, it has already happened.  When my client

8   received bad reviews, she had to delete -- delete

9   all the reviews, including good reviews, in order to

10   address that situation, take the time and effort

11   away from their business to respond to these and

12   address it.

13            And as she testified in her declaration,

14   she has no idea who could have seen these reviews

15   and been turned away.  And if this continues to

16   happen, as it appears to be doing, then this

17   irreparable harm will continue.

18            THE COURT:  Okay.  Thank you very much,

19   Mr. Conrad.

20            I'm going to talk to Mr. Kula or Mr. Joe.

21   Who is it going to be?

22            MR. KULA:  I will, Your Honor.

23            THE COURT:  You don't need a whole lot on

24   the right defendant, but you can go ahead and do

25   some of that.

```
 1              MR. KULA:  I'm going to skip over that and
 2    leave that for you to decide on the papers, which I
 3    don't think will take you very long at all.
 4              THE COURT:  Yeah.
 5              MR. KULA:  Good afternoon, Your Honor.  I
 6    do believe this is a fairly simple case, but I don't
 7    believe it's a simple case in the way that plaintiff
 8    is wanting to portray it.
 9              In particular, the plaintiff cannot take a
10    portion of its registered mark and then take an even
11    smaller portion of the allegedly infringing mark,
12    compare those out of context of the consumer in the
13    marketplace looking for products.
14              THE COURT:  But there's confusion.
15              MR. KULA:  There is confusion.
16              THE COURT:  There is confusion.
17              MR. KULA:  There is confusion.  There's
18    confusion, because I told my knucklehead 16-year-old
19    son to go down to Bisou and apply for a dishwasher
20    job, and he went to the bakery.  That's the kind of
21    confusion we're talking about.
22              THE COURT:  Did it happen?
23              MR. KULL:  No, no.
24              THE COURT:  Okay.  Okay.
25              MR. KULA:  No, I'm saying -- I mean,
```

```
 1   that's the kind of confusion we're talking about.
 2   We're talking about confusion about people calling
 3   the wrong establishment; talking about people going
 4   to the wrong place and dropping mail off at the
 5   wrong place.  That is not the type of confusion that
 6   is relevant to a Lanham Act claim.  We need to have
 7   confusion between actual or potential customers in
 8   the marketplace seeing the product with the mark and
 9   confusing the source or the affiliation of that
10   mark.  We don't have any of that confusion.
11           THE COURT:  Assessing the similarity of
12   marks and services, exact similarities not required.
13           MR. KULA:  No.  I concede that exact
14   similarity is not required.  But as I will get into
15   in a moment, there needs to be a -- a high scrutiny
16   of the marks.  And when you look at the marks in the
17   totality of how they are presented to the consumer
18   in the marketplace, there is virtually no
19   possibility, let alone a likelihood of possibility
20   of confusion.
21           THE COURT:  But there's confusion.
22           Go ahead.  Go ahead.  I'm listening.
23           MR. KULA:  Okay.  Well, if -- if it was
24   the type of confusion that plaintiffs wanted, and
25   that is simply that there is one word among our mark
```

```
 1   that is similar to one word in their mark, then I
 2   would contend that Mick Jagger would have enjoined
 3   Rolling Stone magazine decades ago because he has
 4   trademarks on "Rolling Stone," but the products have
 5   to be similar.
 6           THE COURT:  Not that similar, but go
 7   ahead.  Rolling Stone and the Stones is not the
 8   same.
 9           MR. KULA:  Okay.  But they have to be more
10   similar than a 240-dollar Tomahawk steak and a
11   2-dollar French tart.  They have to be more similar
12   than a 1,500-dollar bottle of Champagne and a French
13   croissant.
14           Now, I think actually, Your Honor, that
15   although I am confident that you are going to find
16   there is no likelihood of confusion when you are
17   looking at the marks in the totality as presented to
18   the consumers in the marketplace, I think actually
19   there is a silver bullet, and that is with regards
20   to the irreparable harm.  Because as plaintiff's
21   counsel conceded, they knew of the possibility of
22   them coming to Dallas as early as late last year or
23   early January of this year.
24           THE COURT:  And they wrote them a letter.
25           MR. KULA:  And they wrote them a letter.
```

```
 1    But they didn't seek preliminary injunction at that

 2    time.  And the cases said four months, six months

 3    waiting period of time, when you know that there's a

 4    potential for harm and not doing anything and

 5    letting a company come in, like my client, and spend

 6    $2 million to open a business and then, after six,

 7    seven months, try to get a preliminary injunction.

 8            THE COURT:  To be realistic, they didn't

 9    get the confusion until after you put down roots.

10    And they couldn't have gotten anything from me that

11    I know of until the company put down roots, right?

12            MR. KULA:  No.  No.  They wrote the letter

13    saying that there's confusion just by simply

14    uttering the word Bisou.  So they should have sought

15    a preliminary injunction or TRO at that point in

16    time, not seven months later.

17            THE COURT:  All right.

18            MR. KULA:  Now, I want to point out that

19    as McCarthy states in McCarthy on Trademarks,

20    probable confusion cannot be shown by pointing out

21    that at some place at some time someone made a false

22    identification.  And that's exactly what all of

23    plaintiff's case is resting on.

24            If -- if granted you overruled the

25    objections on hearsay, I don't know who these people
```

21

```
 1   are calling in, if they are friends or family
 2   members, but --
 3            THE COURT:  It's not hearsay, because they
 4   are not offering it for the truth.
 5            MR. KULA:  But they are offering it for
 6   the truth, Your Honor.
 7            THE COURT:  Okay.
 8            MR. KULA:  They are offering -- because
 9   what relevance does it have that I call if I'm not
10   offering for the truth that I'm confused about a
11   product.
12            THE COURT:  Okay.  Go ahead.
13            MR. KULA:  Okay.  But even if it isn't
14   hearsay, it's still we need actual evidence of the
15   confusion.  We need someone to testify that they
16   went to our place and assumed that the products they
17   were purchasing was sponsored by the bakery.
18            There's no such evidence of that.  And
19   anyone walking into Bisou Continental Cuisine would
20   not for a moment think that they are in a
21   neighborhood bakery.
22            THE COURT:  But they've gotten calls since
23   they opened with questions, Bisous Bisous, including
24   whether the caller may bring balloons and what the
25   hours are, whether they can make a reservation and
```

```
 1   what time it is.  You know, that's just for example.
 2             MR. KULA:  Yes, Your Honor.  But, again,
 3   the trademark covers a very select group of
 4   products.  It's their bakery goods.  It's their
 5   pastries.  It's their croissants.  They don't have a
 6   trademark on every imaginable thing that is involved
 7   in a restaurant ownership.
 8             THE COURT:  But you're having confusion
 9   over the restaurants, over Bisous Bisous and Bisou.
10   I mean you just are, it's apparent.
11             MR. KULA:  It's not the confusion that the
12   lanely act is designed to prevent.
13             THE COURT:  Okay.  Okay.  Go ahead.
14             MR. KULA:  I want to go to the -- to
15   the -- again, the no irreparable harm.
16             Again, besides just statements of "Our
17   reputation has been hurt," there's been no
18   indication that there's any type of irreparable
19   harm.
20             THE COURT:  Well, what about the
21   declaration of Chef Meyer?  She said that they had
22   all these questions about -- about the other
23   business when it was -- you know, it was their
24   business and they were asking about the other
25   business.
```

```
 1            MR. KULA:  Okay.  But, Your Honor, that
 2   doesn't constitute irreparable harm.  Their sales
 3   may have increased because of the notoriety.
 4            THE COURT:  Well, I don't think so.  She
 5   gives an example of confusion, so that's evidence.
 6            MR. KULA:  Confusion -- mere confusion is
 7   not evidence of irreparable harm, Your Honor.
 8            THE COURT:  Well, we're still in the
 9   confusion part as far as I'm concerned.
10            MR. KULA:  Okay.
11            THE COURT:  All right.  Go ahead.
12            MR. KULA:  Okay.  But going on to the
13   likelihood of confusion, I think you need to
14   actually go through each of the steps or each of the
15   digits that we're talking about.
16            Before I go into that, though, with regard
17   to injunctive relief, which I know Your Honor knows
18   very well, it's extraordinary relief, requires a
19   clear and convincing showing.  But the true purpose
20   of preliminary injunction is to maintain the status
21   quo, as we all know.
22            Here, our client has already opened the
23   doors, they have already been servicing.  So what
24   the plaintiff wants is actually extra, extraordinary
25   relief, because they are asking you to basically
```

1  shut down the business and require them to do things

2  to prevent the status quo from maintaining.

3          And there is case law out there that says

4  that their clear and convincing or clearly showing

5  evidence standard is even more heightening when they

6  are asking you to take proactive action to make my

7  client do something and not just maintain the

8  status quo.

9          Again, if we would go back to January of

10 early this year when they first had notice of

11 possible harm, then they could have maintained the

12 status quo.

13         THE COURT:  But I would have said, "That's

14 too speculative."  If they had come to me then, I

15 would have said, "There's nothing to show confusion

16 right now."

17         MR. KULA:  But everything that they are

18 claiming causes confusion is exactly what they were

19 claiming to the Houston attorneys was going to cause

20 confusion.

21         THE COURT:  Well, no, they've had all

22 sorts of instances of confusion since you put down

23 roots.

24         MR. KULA:  The only confusion that they

25 have shown in the Dallas marketplace is based upon

```
1   the disgruntled attorney -- or the disgruntled
2   employee that went out and orchestrated this
3   campaign.
4              THE COURT:  Well, no.  I mean, Chef Meyers
5   has said she's gotten all sorts of phone calls for
6   Bisou to Bisous Bisous.
7              MR. KULA:  Again, there are -- there
8   are -- there is testimony of calls, which I still
9   would contend that the content of those calls is
10  hearsay.  And whether the confusion is simply in
11  the -- in the establishment is not confusion in the
12  product that is being sold in the marketplace.
13             THE COURT:  Well, first of all, hearsay
14  is -- the Rules of Evidence are relaxed in this
15  situation.
16             MR. KULA:  I understand.
17             THE COURT:  So some hearsay is admissible.
18  I don't know if it is or not.  But either way, I
19  think that is admissible.
20             MR. KULA:  Okay.
21             THE COURT:  Okay.  Those are -- I am
22  overruling your objections to all of those, because
23  I think they are admissible.
24             MR. KULA:  I understand, Your Honor.
25             But I think that we need to look at the
```

1   actual substantive, quote, actual confusion.

2   Because if you get rid of the knucklehead

3   16-year-old boy that showed up for a dish washing

4   job and the delivery man that was simply following

5   an address that was put down on the wrong place, all

6   you have -- and get rid of the orchestrated campaign

7   by Ms. Vasquez, you have these few calls.  And even

8   plaintiff admits that the calls were three to six

9   calls, something like that.

10          And I go back to McCarthy's statement,

11  that even if you prove that someone, some place at

12  some time was confused, that isn't enough to prove

13  probable confusion.

14          THE COURT:  What about the screenshots on

15  Google and Yelp.  They were posted on Bisous Bisous'

16  page.

17          MR. KULA:  Again, it's -- I'm beating a

18  dead horse.

19          THE COURT:  I know.  I know.  Go ahead.

20          MR. KULA:  It's not -- it's not any kind

21  of confusion.  It has to be actual confusion of

22  potential or actual customers viewing the mark in

23  the product -- or of the product in the marketplace

24  and purchasing or wanting to purchase a mark and

25  being confused for the source of the affiliation of

```
 1    the mark.
 2             None of that is happening simply by
 3    posting an Instagram picture of me, you know, with
 4    balloons in my hand outside of a restaurant.
 5             THE COURT:  They say that they received
 6    30 -- over 30 of misdirected reviews, like horrible
 7    food, don't go back there, that kind of thing.
 8             MR. KULA:  Yes.  And -- and if you look at
 9    these reviews, it's actually almost comical that
10    they are basing their case on these reviews, because
11    they're -- you can tell that they are bogus just
12    from the reviews.
13             I'm looking at, let's see -- well,
14    first -- one of the first reviews at Appendix 411 is
15    someone telling them, "Guys, this isn't the place
16    the girl on TikTok was talking about."  That was the
17    third review that came in.  So they were on notice
18    right away that these weren't actual reviews.
19             But on page 414, which was up on your
20    screen, Your Honor, here's a review which indicated
21    the person, quote, spit my chewed up food into the
22    water bottle and --
23             THE COURT:  I know.  That's ridiculous.
24             MR. KULA:  There's other ones.
25             Ms. Vasquez, herself, put on one on page
```

```
 1   415.
 2             THE COURT:  But they have had 30
 3   misdirected reviews, so that's putting aside those
 4   few.
 5             MR. KULA:  Your Honor, there's no evidence
 6   that any of those 30 were legitimate.  It could have
 7   been the same person who is claiming that their dog
 8   ran away because the food was bad.  That's on page
 9   417.  Or the review where they say that the food
10   actually tastes like it was chewed by a homeless man
11   and will never go back.
12             And here is the one -- the one instance
13   where there's, quote, arguable confusion among
14   products that are sold at the plaintiff's
15   establishment.
16             This individual says, quote, I ordered a
17   croissant and asked for jam.  Instead, they served
18   the pulverized cockroaches and said it was artisan
19   honey."
20             Come on, Your Honor.  No one is going to
21   believe that that's an actual review, and we don't
22   even sell croissants.  We don't even have -- the
23   only two things that are on our menu that have Bisou
24   related to them is the Bisou Maki and Bisou salad.
25             THE COURT:  Bear with me for just a
```

1    minute.  You are both in the food business.  You are

2    both called Bisous.  And they are getting negative

3    reviews and we think misdirected customers because

4    of you posting -- because of them posting about

5    their experiences in your organization, your

6    restaurant.

7          MR. KULA:  Your Honor, before I got here,

8    I looked up how many taco restaurants have

9    trademarks associated with them.  There are over

10   1700 taco-related trademarks.  Taco Bell, Taco

11   Grande, Taco Bueno.  The fact that they have a

12   trademark on bakery goods and restaurant services or

13   cafe does not allow them to claim a trademark on any

14   product that any restaurant sells.

15         THE COURT:  Um-hum.  Okay.  Okay.

16         MR. KULA:  I really think that -- I know,

17   again, that the evidence of actual confusion, it

18   seems like that is what Your Honor is honing in on.

19   And I don't think that there has been an evidentiary

20   standard that's been met to prove that any of those

21   evidence of confusion calls are actually legitimate

22   calls of consumers or potential consumers who were

23   actually confused in the marketplace about an actual

24   product during a trademark.  So I think they should

25   be discounted unless there --

 1              THE COURT:  Well, in the -- it was

 2    American Century Proprietary Holdings v. American

 3    Casualty Insurance Company, 295 F.App'x 630 -- I

 4    don't know the jump page.  But the -- they said,

 5    "The greater the similarity between the products and

 6    services, the greater the likelihood of confusion.

 7    Direct competition between the parties or services

 8    are not required in order to find likelihood of

 9    confusion.  When products or services are

10    noncompeting, the confusion issue is one of

11    sponsorship, affiliation or connection."

12              So they think that -- I -- I'm telling

13    you, the Bisous Bisous people think that Bisou is

14    them.  They do.

15              MR. KULA:  I -- I don't --

16              THE COURT:  Go ahead.  Go ahead.

17              MR. KULA:  I don't doubt that they think

18    that, but I'm just saying that that doesn't

19    constitute the type of actual confusion that's

20    required under the Lanham Act to help prove a

21    probable or likelihood of confusion.

22              THE COURT:  In that case, they had six

23    instances of confusion over six years.  That's only

24    six over six years.

25              MR. KULA:  And again, I don't have that

31

1    case right in front of me, but I believe from my

2    past reading, each of those evidence of confusion

3    was related to an actual product that beared the

4    actual mark that was seen by a potential or actual

5    customer in the marketplace.  We don't have that in

6    this case.

7             THE COURT:  Okay.  Okay.  What do you

8    think is missing from this case?

9             MR. KULA:  What do I think is missing from

10   the case?

11            THE COURT:  Yes.

12            MR. KULA:  Well, one, I think that the

13   similarities of the mark, if you actually go through

14   the analysis that is required, where you are looking

15   at the mark and you -- as our brief points out, one

16   mark has Bisous Bisous twice in the plural in block

17   letters.  I mean there's cases that go into this in

18   quite detail with regards to the analysis that has

19   to go into looking at the mark.

20            And I know plaintiffs stated this, but I

21   don't believe it's true, is that the fact that we

22   have all lower case and in italics is actually very

23   significant.  Because, again, we're concerned about

24   what the consumer or potential consumer is thinking

25   when they see the mark in the marketplace.  And if

32

1   you see all lower case scripted with "Continental

2   Cuisine" after it, and then you see Bisous Bisous

3   Bakery all blocked, you're not going to think that

4   these people are affiliated.

5          THE COURT:  Okay.  What else?

6          MR. KULA:  Okay.  Again, the products and

7   the services.  The retail outlet is very important.

8   The bakery is open from 8 to 3.  The nightclub is

9   open from 4 to 2 a.m.  The two do not intertwine.

10  You don't have the same type of people that are

11  coming to the bakery as going to the nightclub and

12  vice versa.

13         Advertising outlets, I agree we both are

14  on social media.

15         The intent issue, although all I can do is

16  either go against us or be neutral, the intent is

17  not the intent of picking this mark, yes, I picked

18  this mark.  The intent is, I picked this mark to try

19  and go and usurp on your good will and your

20  reputation.

21         THE COURT:  That's not required, though.

22         MR. KULA:  No.  But I'm saying there was

23  no intent on defendant, and there's no evidence of

24  defendants usurping on plaintiff's good will and

25  reputation by picking that mark.

```
 1              THE COURT:  Okay.
 2              MR. KULA:  Again, the actual confusion,
 3    we've gone over that in depth and we have a
 4    difference of opinion on that.  I will leave it at
 5    that.
 6              The degree of care exercised by the
 7    purchaser.  There's a case specifically -- and I can
 8    give you the cite to it if you want -- that
 9    purchasers of a $100-dollar of wine use a great
10    degree of care.  That's the kind of market that we
11    are in.  We are selling hundreds of thousands of
12    dollars of bottles of wine and Champagne, and they
13    are selling 2-dollar tarts.  I have never had the
14    impulse to go into a nightclub to buy a
15    thousand-dollar bottle of Champagne.  But I readily
16    admit I have had the impulse to go into a bakery and
17    buy a 2-dollar tart.  So the products are totally
18    different, and the degree of care that is exercised
19    by the usual, typical customer is totally different.
20    There's not going to be any actual confusion.
21              So once we go and dispel with the
22    likelihood of confusion, which again cases -- and I
23    believe it might have been your case, Your Honor,
24    were you indicated --
25              THE COURT:  NFL case?
```

```
 1              MR. KULA:  Yes -- the utmost caution,
 2   utmost caution with regards to likelihood of
 3   confusion.  And the similarity marks the John Crane
 4   case that we cited, talks about the total effect.
 5   And in that case, there was a very similar situation
 6   where the word "Rod" was used in part of the mark,
 7   used in part of the mark, but you can't just look in
 8   isolation at that.
 9              I talked about the defendant's intent.
10   And yes, the NFL property case with regards to
11   products claiming -- the products have to be -- your
12   question in the NFL case was, what are we talking
13   about buying?  And your answer was, we're talking
14   about buying football cards.
15              THE COURT:  Yeah.
16              MR. KULA:  And that is the pertinent
17   question to answer in this case.  What are we
18   talking about buying?  We are talking about buying
19   pastries, croissants and tarts.  We're not talking
20   about Tomahawk steaks and Champagne.
21              I already talked about the retail outlets
22   being so different.
23              Oh, and one thing from the Fifth Circuit
24   in the Fuji case, because they rely on that case a
25   lot, and that case makes an important point, that if
```

```
 1   the -- if the plaintiff is not diversified -- or
 2   they might have said it in the converse -- if the
 3   plaintiff is very diversified in products, then
 4   there's a likelihood of confusion.  Because everyone
 5   knows that Coke has a lot of different products, not
 6   just soda.  But the bakery indicates that they are a
 7   niche market.  Not only do they only sell French
 8   pastries, but their advertisement is they customize
 9   them to customers.
10            THE COURT:  Nonetheless, people are
11   getting confused.
12            Go ahead.
13            MR. KULA:  Again, as Your Honor knows, I
14   know we have a difference of opinion in the standard
15   of evidence, but actual confusion is usually proven
16   by survey evidence and actual witnesses, not just
17   Ms. Meyer saying, "I don't know how -- I don't know
18   how much I've been harmed, but it must be a lot
19   because, you know, there would be a million people
20   walking in my door, and there haven't been."
21            THE COURT:  Well, she's just -- go ahead.
22            MR. KULA:  Okay.  You know, it would be
23   very easy for them to come in and show us that their
24   sales have decreased in the last three weeks, four
25   weeks since opening.  They haven't done that,
```

1   because there is no evidence of harm or confusion.

2           They indicated that -- oh, counsel said

3   that it was because we're having our grand opening

4   in August, then it's -- it's even more likely that

5   this is all going to happen again.

6           Again, this was all started from the

7   disgruntled employee and the TikTok and her 634,000

8   posts.  And until there's evidence that proves that

9   all those reviews didn't come from her posts and her

10  friends, then I don't see that there's any evidence

11  of actual confusion.

12          And lastly, unless Your Honor has

13  questions, again, plaintiff was talking about how we

14  had Bisou in our hashtags.  Their trademark is on a

15  very select group of products.  It's not even just

16  all bakery products, they specifically disclaimed

17  chocolate and other things.  It's French pastries,

18  croissants, tarts and some of the other words I

19  can't pronounce.

20          And our -- I thought you were going to

21  interrupt -- interject.  And our products are

22  obviously much more diversified, going from salads,

23  appetizers, Champagnes, cocktails and the whole

24  service of entertainment.  It's not just food, it's

25  food and entertainment.  And even just the casual

1    looking at our gallery in the appendix will show

2    that there's no possibility of anyone being confused

3    at our cuisine -- continental cuisine establishment

4    compared to their bakery.

5            Does Your Honor have any questions?

6            THE COURT:  No, I don't right now.  Thank

7    you.

8            Are you going to represent Cle, the new

9    party to this case?

10           MR. KULA:  Yes, Uptown Bisou?

11           THE COURT:  Yeah.

12           MR. KULA:  Yeah.

13           THE COURT:  Okay.  Come on back up here.

14           Tell me about -- about what you have to

15   say, Mr. Conrad, about his objections.

16           MR. CONRAD:  Yes, Your Honor.  I'm happy

17   to address any points that defense counsel --

18           THE COURT:  Well, you know, he says that

19   the confusion has to be as to the product and all

20   that, so very specifically, you know, what do you

21   say to that?

22           MR. CONRAD:  I think that what he's

23   getting at is that there's a -- a type of

24   infringement called "forward confusion."  And I

25   believe what he's trying to say is that when you

38

1    think about what may be likely confusion, using the

2    word "likely" there, you have to look at consumers

3    and what they may purchase.

4              That's not necessarily true, because

5    the -- the trademark rights are broader than that.

6    It's avoiding association with.  That's in the

7    Lanham Act Statute.

8              So they have -- they, being the Cle

9    Group's restaurants, which is the media associates

10   with Bisou restaurants, they have had negative

11   press, bad press.  That -- that is likely to spill

12   over to us.

13             THE COURT:  By who?  Who have had they had

14   negative press from?

15             MR. CONRAD:  So in our papers there was,

16   for instance, I believe, during the early stages of

17   the pandemic, when emergency orders and the like

18   were happening, and actually months into that, they

19   were flouting the restrictions that were in place.

20             THE COURT:  Yeah, yeah, I know that.

21             And there was press about that?

22             MR. CONRAD:  There was bad press, and

23   we've got those articles in the briefing.

24             THE COURT:  Okay.

25             MR. CONRAD:  The problem there is that

39

```
 1    that mark, Bisou, if it becomes associated with
 2    their doings, which is -- is not good, it's not
 3    family friendly, it's not the image that Bisous
 4    Bisous wants to have for their mark, that's a
 5    negative association, which is infringement.
 6              THE COURT:  Why isn't it just baked goods
 7    or something like that?  Why isn't it just off there
 8    because it's just baked goods and restaurants?
 9              MR. CONRAD:  You mean why -- why is our
10    mark not limited to baked goods?
11              THE COURT:  Yes.
12              MR. CONRAD:  Because the mark is not
13    limited to what the federal registration says.  One,
14    we have multiple federal registrations, though, one
15    of which is for cafe and restaurant services, which
16    is exactly what's at issue here.
17              THE COURT:  Okay.
18              MR. CONRAD:  But more importantly,
19    trademark is not the registration that provides
20    certain rights.  Trademark is the use here in Dallas
21    since 2012, I believe, and at least 2014, 2015, when
22    we -- when Ms. Meyers opened the restaurant
23    storefront.  We've been using it in Dallas and have
24    become famous in Dallas, or at least very well known
25    with media, you know, best bakery in Dallas and all
```

```
 1   sorts of rewards.  So that use is all that matters.
 2   And that is as close as you can get to Bisou
 3   restaurant without opening a restaurant that sells
 4   Tomahawks.
 5           Your Honor, I have two cases here that
 6   might be of assistance.
 7           THE COURT:  Absolutely.
 8           MR. CONRAD:  I'm not sure if they are
 9   cited, one or two, maybe not.
10           THE COURT:  Exxon.
11           MR. CONRAD:  Exxon is one.
12           THE COURT:  I have that.
13           MR. CONRAD:  Armco v. Armco Burglar Alarm
14   Company.
15           THE COURT:  I don't have that one.
16           MR. CONRAD:  693 F.2d 115.
17           THE COURT:  If you have an extra copy.
18           MR. CONRAD:  I do not.  I have my copy.
19           THE COURT:  F what?
20           MR. CONRAD:  693 F.2d 115.
21           That's from 1982, and it is 5th Circuit.
22           THE COURT:  Okay.
23           MR. CONRAD:  And there -- instances of
24   actual confusion.  So actual confusion does not have
25   to be as narrow as defense counsel --
```

41

1              THE COURT:  Yeah, I didn't think so.  I
2    was just curious about that.
3              MR. CONRAD:  Here, the actual confusion
4    that happened was Armco's lone Tarrant County
5    employee testified that he had received phone calls
6    at least once a month from people trying to reach
7    Armco Burglar Alarm.  That's it.  There's no more
8    evidence that the Court relied on.
9              He also testified that two acquaintances
10   of his had asked, "When did y'all get into the
11   burglar alarm business?" assuming I got the accent
12   right.  But acquaintances, those are customers.
13             THE COURT:  I will let you respond to
14   that.
15             MR. CONRAD:  Fletcher's State Fair
16   Original Corny Dogs v. Fletcher Warner Holdings,
17   LLC, 434 F.Supp.3d 473.
18             THE COURT:  Hold on a second.
19             F.Supp.3d 473.
20             MR. CONRAD:  Eastern District of Texas.
21             And here, consumers, venues and events
22   that solicit vendors have all been confused.  It's
23   not customers.  Additional instances in which
24   consumers have been confused and posted their
25   misidentification on social media or shared their

1   confusion with the head of marketing event.

2          So again, those were not actual customers

3   that purchased something.  But again, that was

4   actual confusion.

5          THE COURT:  Okay.  That's what I needed to

6   hear.

7          MR. CONRAD:  Would you like these, Your

8   Honor?

9          THE COURT:  Yeah.

10          MR. CONRAD:  May I approach?

11          THE COURT:  Give it to her, Jordan.

12          All right.  Thank you.

13          Anything else?

14          MR. CONRAD:  Your Honor, we're not trying

15   to shut down their restaurant, that's not the relief

16   requested, just ceasing the use of marks.  They can

17   sell Tomahawk steaks and wine under any other mark.

18          THE COURT:  Yes.

19          MR. KULA:  Yes, just very briefly, Your

20   Honor.

21          I don't believe there's been any evidence

22   shown of actual harm, let alone irreparable harm.

23   They haven't shown any -- any lost sales, any --

24          THE COURT:  They have rebuttal presumption

25   of that.  Have you rebutted that?

```
 1              MR. KULA:  Well, yes, because, as I said,
 2    even if you show there's a likelihood of confusion,
 3    then you're assuming that there's going to be
 4    irreparable harm.  The rebuttable presumption was
 5    they sat on their rights for seven months and let
 6    the harm come to them.  That's one.
 7              THE COURT:  I'm saying that I wouldn't
 8    have given them an injunction with the stuff they
 9    had in January.  But go ahead.
10              MR. KULA:  Okay.  The other rebuttable
11    presumption is that -- or the other rebut to the
12    presumption is that they haven't shown any harm, and
13    it would be very easy to come in and show harm.
14    There is two things that I wanted to point out.
15              One, in plaintiff's presentation, he
16    showed pictures that are put on the -- on the
17    bakery's site.  And in the middle there was a
18    picture of our client's establishment.  And his
19    statement was, "You can obviously see that's not
20    family friendly."  And that's a key to it.  No one
21    is going to be confused by the things that are on
22    our website or on our Facebook page with a
23    neighborhood bakery that caters to the local
24    community.
25              I just want to give you -- or if Your
```

```
 1    Honor wants --

 2             THE COURT:  I'm open to anything you want

 3    to tell me.

 4             MR. KULA:  Okay.  I would like to just

 5    give you some case cites.  That's what I was going

 6    to say.  I will give you case cites or my folder of

 7    the cases.

 8             THE COURT:  No, case cites.

 9             MR. KULA:  Okay.  Okay.  So this is

10    Checkpoint Systems v. Check Point Software

11    Technologies, 269 F.3d 270.

12             Now, it's a 3rd Circuit case, but it does

13    state that, "To prove likelihood of confusion,

14    plaintiffs must show that, quote, consumers viewing

15    the mark would probably assume the product or

16    services it represents is associated with the source

17    of the different product services identified by the

18    similar mark."

19             And I don't believe that we have that

20    here.  I won't go into all the quotes since I gave

21    you the cite.

22             THE COURT:  Please don't.

23             MR. KULA:  I won't.

24             The other case that I want to point out,

25    which is somewhat similar, is Planet Hollywood v.
```

```
 1   Hollywood Casino, and that is 80 F.Supp.2d --
 2            THE COURT:  Okay.  80 F.Supp.2d.
 3            MR. KULA:  -- 815, and that's your sister
 4   Court in the Northern District of Illinois.
 5            Similarly, Ellipse Communications, Inc.,
 6   v. Caven, C-A-V-E-N, and that is a 209 -- 2009
 7   Westlaw.
 8            THE COURT:  Okay.  What's the Westlaw
 9   number?
10            MR. KULA:  497268.
11            THE COURT:  Oh, wait, wait, wait.  Slow
12   down 497.
13            MR. KULA:  268, sorry, and that's out of
14   Your Honor's Court.
15            THE COURT:  Okay.  I think I have enough
16   cases.
17            Anything else?
18            MR. KULA:  Two more cases.
19            THE COURT:  Okay.  Okay.
20            MR. KULL:  I won't -- I won't cite your
21   own since you know them, I'm sure, quite well.
22            THE COURT:  Yeah.
23            MR. KULA:  The other two that I want to
24   bring to your attention is -- sorry.
25            I'll just give you the cite, because I
```

```
 1   can't pronounce the first one.
 2            THE COURT:  That's fine.
 3            MR. KULA:  730 F.3d 494, and that's a 6th
 4   Circuit case.
 5            THE COURT:  Okay.
 6            MR. KULA:  And the last one is Water Pik,
 7   Inc., v. Med-Systems, and it is 848 F.Supp.2d 1262
 8   out of the District of Colorado.
 9            THE COURT:  Okay.  I will go -- I'm going
10   to take a break and look at all this stuff.
11            Do you have anything else you wanted to
12   say?
13            MR. KULA:  No, Your Honor, unless you had
14   questions.
15            THE COURT:  Anything else, Mr. Conrad?
16            MR. CONRAD:  No argument, Your Honor.  But
17   I do have transcripts for the two victims we
18   submitted with the supplemental filing.  Would you
19   like those?
20            THE COURT:  Yes, yes, yes.
21            MR. CONRAD:  May I approach?
22            THE COURT:  Yes, you may.  Give them to
23   her.
24            Okay.  We will be in recess for about 10
25   or 15.
```

```
 1              (Recess taken.)

 2              THE COURT:  Sorry that took so long.

 3              Let me just start up here.

 4              First, as Bisous Bisous argues, it has a

 5   protectable right to all its registered marks and

 6   Bisous Bisous is -- is -- because -- at least with

 7   respect to its word marks.  Bisous Bisous' word

 8   marks protects the use of the words "Bisous Bisous"

 9   in various classes, including -- let me get my

10   glasses here.  I don't see them -- including cafe

11   services, restaurant services, without regard to the

12   font, style or color of the words.

13              That's plaintiff's appendix 22 to 25.

14              Bisous Bisous' design mark protects its

15   logo.  Because Bisous Bisous' logo is more distinct

16   than the words "Bisous Bisous" alone, defendants'

17   use of the word "Bisou" in their advertisement does

18   not look similar to Bisous Bisous' logo.  I do not

19   consider Trademark Number 4811208.  It is not

20   necessary, as infringement of one trademark claim is

21   enough for the other.  So, anyway, the trademark is

22   broader than I think you have described it,

23   Mr. Kula.

24              So the -- you argue that the -- your

25   rights -- that the rights are limited to the market
```

```
 1    in connection with the bakery goods.  Well -- but
 2    Cle or your company ignores Bisous Bisous owns both
 3    the word mark for Bisous Bisous and the design mark
 4    for its logo in the cafe and restaurant service.
 5    This class includes services for providing food and
 6    drink.  Thus, Bisous Bisous's interest is not
 7    necessarily as narrow as Cle, the defendants, state.
 8    Because Cle does not contest whether Bisous Bisous
 9    has a protectable right to its mark and consequently
10    focuses on disproving likelihood of confusion, I
11    find that factor in favor of Bisous Bisous.
12              So likelihood of confusion has a lot of
13    things about it, but one of the things is a type of
14    mark.  I think this is an arbitrary mark.  I don't
15    know if -- I think you, Mr. -- Mr. Conrad also
16    thought it was an arbitrary mark.  I don't know if
17    you did, Mr. Kula.
18              MR. KULA:  Yes.
19              THE COURT:  Okay.  It's arbitrary, and so
20    we know that, and so that's the case.
21              Similarity between the marks.  I'm not
22    going to talk about that because we have no need to.
23              In assessing the similarity of products
24    and services, exact similarity is not required.
25    That's the Dallas Cowboys case, 615 F.Supp. 638.
```

```
1    There may be a likelihood of confusion even if the
2    parties are not direct competitors.  You-all know
3    that, I talked about that, and I'm not going to cite
4    to the case; no need to.
5            The Court has repeatedly held that direct
6    competition is not the key to trademark
7    infringement, rather the gist of the action lies in
8    the likelihood of confusion of the public.
9            Indeed, both defendant and plaintiff serve
10   French-inspired food.  Bisous Bisous' menu has
11   macarons.  Bisous Bisous' menu has croissants and
12   eclairs, and it goes same -- you know, a little bit
13   with Bisou.
14           Bisou Dallas menu includes, among other
15   things, escargot and bone marrow, cake beignets,
16   crab cake beignets and pommes frites.
17           The retail outlets are similar.  Both are
18   brick-and-mortar stores on McKinney Avenue in Uptown
19   Dallas.  That is pretty key.  Cle makes no direct
20   argument that retail outlets are dissimilar;
21   however, many -- it did today.  However, many times
22   throughout its briefing, it refers to Bisou Dallas
23   as a 10,000 square foot Social Dining Hotspot.  But
24   the establishments have likely similar purchasers
25   due to their proximity.  And they -- to the extent
```

1    Bisou Dallas attracts persons across DFW, Bisous

2    Bisous likely does, too, and I will go into it in

3    the order about why I think that.

4              The identity of advertising media used.

5    This factor favors Bisous Bisous.  The greater the

6    overlap in the marketing approaches of the two

7    entities, the greater likelihood of confusion.

8    That's Dallas Cowboys case, 616 F.Supp.2d at 639.

9              Bisous Bisous posits that both it and

10   Bisou Dallas rely on the website and social media to

11   advertise.  Cle concedes both bakery and the

12   Dallas-based restaurant currently use the same

13   advertising channels.

14             And finally, actual complaints of

15   confusion.  First of all, I want to be clear that,

16   you know, nonconsumer confusion can be evidence of

17   confusion, but I don't think that's what we're

18   really talking about.  Because you're saying,

19   Mr. Kula, that it has to be at the time of purchase

20   or something.  But I think it could be a variety of

21   circumstances that are confusing to the ultimate

22   purchaser, like the advertising, the willingness --

23   you know, the talking about it on the internet.  I

24   don't think it has to be the actual time they buy

25   the product that they are supposed to be confused.

1   I think it can be a wide variety of circumstances.

2           Anecdotal instances of consumer confusion

3   or consumer surveys.

4           So testimony of a single known incidence

5   of actual confusion has been found sufficient

6   evidence to support the district court's finding of

7   actual confusion.

8           Now, I know this is like July, happened in

9   July at least.  It's only the beginning of August or

10  August 11th, so we have instances of confusion.

11  Bisous Bisous has presented evidence of actual

12  confusion, a declaration of Chef Meyer in which she

13  states that since Bisou Dallas opened, Bisous Bisous

14  has received phone calls with questions for Bisou,

15  including whether the caller may bring balloons and

16  the hours are -- what the hours are and whether the

17  caller can make a reservation and what the wait time

18  is.

19          In fact, Bisous Bisous's owner states in a

20  July 20, 2021, Bisou's bakery manager counted 11

21  call that were intended for Bisou Dallas, and that's

22  July 10, 2021, just a mere month ago.

23          It's -- it's -- so second, Bisous Bisous

24  has submitted screenshots of Google and Yelp reviews

25  posted soon after the day Bisou Dallas opened that

```
 1   were intended for Bisou Dallas but were erroneously
 2   posted on Bisous Bisous's page.  And I told you-all
 3   about that.  We have gone over that ad nauseam.
 4          Then Chef Meyer described two following
 5   incidents.  On June 9, 2021, an individual
 6   mistakenly showed up at Bisous Bisous for an
 7   interview on an information and belief he was
 8   seeking to interview at Bisou Dallas.
 9          And one week prior to the opening of Bisou
10   Dallas, a carrier mistakenly delivered a large set
11   of supplies addressed to Bisou Uptown and intended
12   for Bisou Dallas.
13          So I think Bisous Bisous has clearly
14   demonstrated actual confusion between it and Bisou
15   Dallas.  Though it's not clear from the record
16   whether Bisous Bisous continues to receive
17   misdirected calls, I think a month -- let's just say
18   a month ago is -- is -- is close enough for me.
19          So, you know, on the -- let's see.
20          So, you know -- and I'm also not going to
21   reject the confusion of the interview applicant and
22   parcel carrier wholesale because I have held before,
23   courts have held before, that nonconsumer confusion
24   can be -- provide some slight discounted weight.
25          So all of these things, and there's so
```

53

```
 1  many -- I mean, there's like 11 calls in one day or
 2  11 calls that the bakery manager talked about.  I
 3  think that's enough to establish confusion.  And I
 4  don't think you have rebutted the presumption that
 5  there is rebuttable -- there's a rebuttable
 6  presumption of irreparable harm.
 7          So I'm going to grant the injunction.  We
 8  will keep it narrow to them in Dallas, getting rid
 9  of their name, their trademark, but I won't do
10  anything to the Houston entity right now.
11          Any questions about this?
12          MR. KULA:  Yes, Your Honor.  We would
13  request a bond be put up by the plaintiffs.
14          THE COURT:  Okay.
15          MR. KULA:  I indicated on page 1 of my
16  brief, $500,000.
17          THE COURT:  Mr. Conrad.
18          MR. CONRAD:  Your Honor, we laughed at
19  that, as well.  The plaintiffs -- the defendants
20  have not put on any evidence for any harm that may
21  incur to support a bond of any kind.  And in fact,
22  there's authority in the 5th Circuit that the --
23  that you don't have to require a bond in order to
24  issue an injunction.
25          So if there's any bond that this Court
```

1    deems fit, it should be very low, you know, a
2    thousand dollars or something of that nature.  So
3    that's our position.
4            THE COURT:  Right now I'm not going to
5    require a bond.  You can file a motion, and I will
6    consider that again.  But I'm not going to require a
7    bond right now.  Okay.
8            Anything else?
9            Mr. Kula?
10           MR. KULA:  No -- I'm sorry.  No, Your
11   Honor.
12           THE COURT:  All right.
13           Mr. Conrad?
14           MR. CONRAD:  No, Your Honor.
15           THE COURT:  Okay.  Thank you.
16              (Court in recess at 4:47 p.m.)
17
18
19
20
21
22
23
24
25

1                  C E R T I F I C A T E

2          I, Shawnie Archuleta, CCR/CRR, certify

3     that the foregoing is a transcript from the record

4     of the proceedings in the foregoing entitled matter.

5          I further certify that the transcript fees

6     format comply with those prescribed by the Court and

7     the Judicial Conference of the United States.

8                  This    day of    2021.

9

10

11                         s/Shawnie Archuleta
                           Shawnie Archuleta CCR No. 7533
12                         Official Court Reporter
                           The Northern District of Texas
13                         Dallas Division

14

15

16    My CSR license expires:  December 31, 2021

17    Business address:  1100 Commerce Street
                         Dallas, TX  75242
18    Telephone Number:  214.753.2747

19

20

21

22

23

24

25

**SHAWNIE ARCHULETA, CSR/CRR**
**FEDERAL COURT REPORTER – 214.753.2747**